# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert Fulton,                                    :
                        Petitioner        :
                                                  :
            v.                                    :   No. 672 C.D. 2019
                                                  :   Submitted: June 5, 2020
Department of Transportation,        :
                        Respondent       :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge[1]
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge


*OPINION NOT REPORTED*


**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                    **FILED:  February 19, 2021**


            Robert Fulton (Fulton), *pro se*, petitions for review of an order of the
Department of Transportation (Department), (dated April 1, 2019, and issued
April 2, 2019), which denied exceptions and adopted the proposed report of Hearing
Officer Michael H. Kline (Hearing Officer), dated June 15, 2018 (Report).[2]  The
Report affirmed and reinstated a decision by the Department's Bureau of Motor
Vehicles (Bureau) to suspend Fulton as a certified emission inspector pursuant to
Section 4726(b) of the Vehicle Code, 75 Pa. C.S. § 4726(b), permanently for
furnishing 3,086 certificates of emission inspection without inspecting the vehicles

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson
became President Judge.

[2] Executive Deputy Secretary of Transportation Leo D. Bagley (Secretary) issued the
Department's order.

and for fraudulent recordkeeping. For the reasons discussed below, we affirm the Department's order.

## I. BACKGROUND

Fulton operated a vehicle inspection station at 1324 East Washington Lane in Philadelphia. (Reproduced Record (R.R.) at 6a.) Fulton was the only certified vehicle emission inspector at the station.[3] (R.R. at 144a.) The Bureau notified Fulton on November 10, 2014, that it intended to permanently suspend his inspector certification.[4] (R.R. at 6a.) The Bureau also notified Fulton of his right to request an evidentiary hearing to challenge the permanent suspension. (*Id.*) Fulton, through his attorney, requested a hearing on November 20, 2014. (R.R. at 8a.) The Hearing Officer, after a series of continuances and Fulton's loss of an attorney to represent him, held a hearing on February 8, 2018. (R.R. at 84a.)

### A. Bureau's Case

The Bureau called Georgeann Jordan (Jordan) as its only witness at the hearing. (R.R. at 119a-20a.) Jordan testified that she was the Regional Manager for Parsons Corporation (Parsons), a company that subcontracts with the Department to audit and investigate inspection stations in a seven-county area near Philadelphia. (*Id.*) Jordan testified that, in her prior capacity as a Parsons's Audit Manager, she

---

[3] A "certified emission inspector" is "a person who holds a valid certification card issued by the Bureau which certifies that the person is qualified and has passed the requirements to perform emission inspections on subject vehicles in an appointed emission inspection station." 67 Pa. Code § 177.3. For purposes of convenience, we will refer to a "certified emission inspector" as simply an "inspector" throughout this opinion.

[4] We note that on February 6, 2014, the Bureau previously cited Fulton for the same violations at issue in the present proceeding. Those citations resulted in the suspension of his certification as an inspector for one year for furnishing certificates of emission inspection without conducting the inspections and for one year for engaging in fraudulent recordkeeping concerning emission tests. The suspensions ran consecutively for a total suspension of two years ending on January 6, 2016. (R.R. at 156a-57a, 218a, 221a.)

was involved in the investigation of Fulton's emission station in 2013 and 2014. (*Id.*) Jordan testified that she and another Parsons's employee suspected that Fulton conducted improper emission inspections at his station. (R.R. at 121a.)

Jordan first explained how Fulton should conduct emission inspections. (R.R. at 123a.) Jordan testified that Fulton "would be expected to get the registration information on the vehicle[] and test the car according to procedure on a certified OBD-II machine." (*Id.*) An OBD-II machine, also called an analyzer, is an emission testing machine that the Department approves for emission inspections.[5] (*Id.*) The analyzer at issue here is "a two by four by four foot high box which contains a Datalink connector, a bar scanner, a computer, a monitor and a keyboard." (*Id.*) Jordan testified that, as part of the emission inspection, Fulton should

> check[] to see that the registration for the vehicle is correct. And that's [sic] the vehicle that he's testing.
>
> He then goes into the [analyzer] using his license, which will permit him to go into the [analyzer], and he will begin an emission[] inspection. He will be prompted through the screens, and he will enter the information for the vehicle to be tested.
>
> Then he will test the gas cap, do the test on the gas cap. And then he will plug the . . . connector into the vehicle that is being tested. And the information is pulled out from that.
>
> If the vehicle passes [the] emission[] [inspection], he will be advised so. He will then enter in the sticker number, put the sticker on the vehicle and the test is completed. Also, there's a vehicle inspection report that's printed out on each test. He's also required to give a copy of that vehicle inspection report to the consumer.

---

[5] Throughout this opinion, for purposes of simplicity, we refer to the OBD-II machine used by Fulton as an analyzer.

(R.R. at 124a.) Jordan testified that the records from a station's emission inspections are uploaded into the Department's vehicle inspection information database (VIID).[6] (R.R. at 121a.)

Jordan testified that, using the VIID, she reviewed Fulton's emission inspection records for the period of January 2013 to September 2013. (R.R. at 121a-23a.) After downloading the data from the VIID, she created three spreadsheets to analyze the data, sorting it into: (1) Legitimate Tests; (2) Fraudulent Vehicle Emission Tests; and (3) Spot Checks.[7] (R.R. at 122a-23a.) Jordan testified that the data indicated that Fulton utilized a "clean screening" process when conducting emission inspections. (R.R. at 132a-33a.) A clean screening process is when an inspector uses a vehicle, known as the donor or substitute vehicle, on multiple emission tests while a different vehicle's information is used for the official records. (R.R. at 133a.) According to Jordan, Fulton's records indicated that he clean screened vehicles and gave "passed" emission test stickers to customers even though the vehicles were not properly tested. (*Id.*)

---

[6] The VIID is "[t]he vehicle database established to collect inspection test data and to provide emission inspection test standards to emission inspection stations for the purpose of conducting the appropriate emission inspection." 67 Pa. Code § 177.3.

[7] We note that at the February 8, 2018 hearing, the Legitimate Tests spreadsheet was identified as Exhibit C-3. (R.R. at 223a-24a.) The Fraudulent Vehicle Emission Tests spreadsheet was identified as Exhibit C-4. (R.R. at 225a-324a.) The Spot Check spreadsheet was identified as Exhibit C-5. (R.R. at 325a-27a.) The Hearing Officer, without objection from Fulton, admitted all three exhibits into evidence. (R.R. at 144a-46a.)

Jordan testified that the first indicator that Fulton used a clean screening process was an "extreme" absence of an OBD[8] VIN[9] for the vehicles he tested that were model year 2005 or newer. (R.R. at 125a, 132a.) An inspector must provide certain vehicle information at the time of the emission inspection that can be input into the analyzer in one of three ways: (1) manually typing everything; (2) using a bar code reader; or (3) if the car was previously inspected, using the inspection report already on the computer system. (R.R. at 127a.) During the emission inspection, vehicles that are model year 2005 or newer are compatible with the OBD Datalink[10] connecter that automatically draws the VIN into the analyzer. (R.R. at 128a.) Jordan explained that the absence of OBD VINs indicated that the OBD Datalink connector was not attached to the tested vehicles for the emission inspections. (R.R. at 132a.)

Jordan testified that the second indicator of a clean screening process involved the parameter identification number (PID) count that represents the number of portals that can be read on the vehicle's computer. (R.R. at 129a.) There are ninety-nine potential numbers that can be read as a PID, and, generally, the PID count is a different number for different vehicle models. (R.R. at 129a-30a.) Jordan explained that newer vehicles tend to have a higher PID count because they are more

___

[8] OBD, or Onboard Diagnostics, is "[a] system of vehicle component and condition monitors controlled by a central, onboard computer designed and programmed, among other things, to signal the motorist when conditions exist which could lead to (or which has already produced) a component or system failure." 67 Pa. Code § 177.3.

[9] The VIN is "[a] combination of numbers or letters, or both, which the manufacturer assigns to a vehicle for identification purposes, or, if no VIN is present on the vehicle, which the Department may assign for identification purposes." 67 Pa. Code § 177.3.

[10] The OBD Data Link Connector (DLC) is "[t]he interface which allows connection of the vehicle's OBD computer to an OBD scanner. Connecting an OBD scanner to the DLC allows [inspection/maintenance] inspectors and vehicle repair technicians to read the readiness status of the vehicle's various onboard monitors and to read any diagnostic trouble codes recorded by the OBD computer." 67 Pa. Code § 177.3.

5

"technically[]sophisticated." (R.R. at 130a.) The vehicles Fulton tested had an identical PID count of twenty rather than a variety of numbers. (R.R. at 131a.)

Jordan testified that the third indicator of a clean screening process concerned the test vehicles' power control module identification number (PCM ID) that is an identifier of the vehicle's internal computer. (R.R. at 130a.) There are about forty different labels of PCM IDs that are not specific to any make or model of vehicle, but some vehicles could share the same PCM ID if they came from the same manufacturer. (*Id.*) The vehicles Fulton tested had an identical PCM ID of ten, which is an indicator that the same vehicle was being used for multiple tests as part of a clean screening process. (R.R. at 131a.)

Jordan testified that the fourth indicator of a clean screening process related to the test vehicle emission parameters. (R.R. at 130a.) During a vehicle emission test, eight emission parameters are reviewed. (*Id.*) Each of the parameters are identified by either a zero, one, or two. (R.R. at 130a-31a.) "Zero" indicates that the function does not exist, "one" means that the function exists and is ready for testing, and "two" means it is an unset monitor (*i.e.*, the parameter exists but is not ready for testing). (R.R. at 131a.) Jordan testified that generally, the combination of numbers for these parameters will be different for each vehicle tested. (*Id.*) Jordan testified that the vehicles Fulton tested had the same combination of numbers for these eight emission parameters. (*Id.*)

Jordan testified that she investigated whether the analyzer could have malfunctioned. (R.R. at 139a.) She spoke to repair technicians for every manufacturer of Department-approved analyzers and showed the data to people who wrote analyzer software in an effort to obtain opinions about whether an analyzer malfunction could produce the same results. (R.R. at 139a-40a.) Jordan testified

6

that she ultimately concluded that there was not a good explanation that Fulton's data was due to an analyzer malfunction or software error. (*Id*.)

Jordan testified that she and another Parsons's employee met with Fulton at his station in January 2014. (R.R. at 140a.) She showed Fulton her investigation information and asked him to explain the anomalies. (R.R. at 141a.) Fulton told her that his analyzer was malfunctioning, that he contacted a technician to fix it, and when the technician came to the station, the technician informed him that it was "going to be a couple of thousand dollars to fix the machine," so he did not have the analyzer repaired. (R.R. at 141a-42a.) Jordan testified that the analyzer appeared to be functioning when she was at the station. (R.R. at 142a.) Fulton neither had any evidence of repair receipts nor did he provide her with any indication that anyone repaired the analyzer. (R.R. at 143a.) She called the analyzer's manufacturer and inquired when Fulton's analyzer was last repaired. (*Id*.) Jordan testified that the company informed her that the last recorded repair on Fulton's analyzer was in 2007 or 2008. (*Id*.)

Jordan testified that, at the January 2014 visit to Fulton's station, she asked Fulton if he would test a vehicle that was right outside the door of his station because, "[g]enerally, if there is a donor vehicle it doesn't go far." (R.R. at 142a.) Fulton had an older Ford vehicle in the lot, but, when she asked him to test it using the analyzer, he told her that the vehicle had transmission problems and could not be tested. (*Id*.) She informed Fulton that, if his machine was malfunctioning at any time, she would come back to his station with five vehicles and would test them to see whether his analyzer was working properly. (R.R. at 142a-43a.) Jordan testified that Fulton never called her about testing the five vehicles. (R.R. at 143a.) The Bureau's attorney asked Jordan what an inspector is supposed to do when the

7

analyzer is broken, and she replied "[i]f the [analyzer] is broken you can't use it for a[n] [emission] test." (R.R. at 144a.) The Bureau concluded its direct examination of Jordan and entered numerous documents related to her testimony into evidence. (R.R. at 144a-46a.)

Fulton, during his cross-examination of Jordan, asked if she had received messages on her answering machine from him. (R.R. at 152a.) Jordan admitted that she had. (*Id*.) The Hearing Officer asked Jordan whether the inspection sticker number is entered manually into the analyzer or is it something that is automatically done. (R.R. at 153a.) Jordan replied that the inspection stickers are ordered by the station, registered to the station, and upon completion of a successful test, the analyzer will prompt the inspector to input the next sticker number that he wishes to issue. (*Id*.) Jordan added that the information would be electronically included in the VIID, but if there was an aborted test (*e.g.*, the inspection began but was not concluded) the data would not be sent to the VIID. (*Id*.) The Hearing Officer asked Jordan a few clarification questions and then provided the Bureau's attorney the opportunity to ask redirect questions to Jordan. (R.R. at 156a-59a.)

Jordan, on redirect, testified that Fulton had "left a couple of . . . messages on [her] answering machine," but she "did not call him back." (R.R. at 160a.) Jordan testified that she could not recall why she did not return Fulton's calls. (*Id*.) Fulton, on recross-examination, asked Jordan whether another Parsons's employee tested his Ford vehicle with an analyzer when she was at his station in January 2014. (R.R. at 161a.) Jordan replied that she sent the employee out to the old Ford to get a VIN number, but he did not have an analyzer machine to test the vehicle. (*Id*.) Fulton asked Jordan again why she did not return his answering machine messages,

and she reaffirmed that she could not recall why she did not return his messages. (R.R. at 162a-63a.)  The Bureau concluded its case.  (R.R. at 165a.)

### B.  Fulton's Case

Fulton testified on his own behalf that he had "a problem with the analyzer." (R.R. at 165a.)  Fulton offered into the record Exhibit "A-1," which included:  (1) a letter from Fulton to the Hearing Officer, dated February 6, 2018, listing his arguments against the permanent suspension of his certification; (2) an "OBD Readiness Testability Issues" report from the United States Environmental Protection Agency (EPA), dated June 2012, that purportedly specified errors for analyzers that occurred during the emission inspection process with various makes and model years of vehicles; and (3) a photograph that Fulton took in December 2014 of his analyzer's monitor with the message "communication error with IOBoard.  Click retry to check communication again" on it.  (R.R. at 166a, 197a-206a.)

Fulton testified that, during Jordan's visit to his station, he demonstrated that his analyzer was malfunctioning and that it was "affecting the data transmitted to [the Department]."  (R.R. at 167a.)  He explained that the photograph of his analyzer monitor showed the error message that constantly was there, although the machine allowed the operator to hit the "retry" button.  (*Id.*)  When he hit the "retry" button, the analyzer allowed him to issue an inspection sticker.  (R.R. at 168a.)

The Bureau cross-examined Fulton after he concluded his testimony. (R.R. at 175a.)  Fulton testified that the EPA report that he submitted as evidence generally applied to problems with analyzers but admitted that it did not address his specific analyzer.  (R.R. at 176a.)  He did not know there was a problem with his analyzer until Jordan came to his location in January 2014.  (*Id.*)  Fulton testified

9

that the error message that was on his analyzer's monitor occurred before Jordan's January 2014 visit, that he pressed the "retry" button on the analyzer as many as 3,000 times when conducting emission inspections, and that he never thought "it was a problem." (R.R. at 177a.)

Fulton testified on redirect examination that he averaged 5,000 to 7,000 vehicle emission inspections per year at his station. (R.R. at 183a.) Fulton explained that four or five other garages near his station brought vehicles to him for emission tests. (*Id.*) On recross-examination, Fulton admitted that he did not demonstrate to Jordan that the analyzer was not working properly, but he did show her that one of the analyzer's cords was cracked. (R.R. at 188a.) At the conclusion of Fulton's case, the Bureau objected to Exhibit A-1 based on relevance, but the Hearing Officer overruled the objection and admitted the document into evidence. (R.R. at 190a.) The Hearing Officer, after addressing a few procedural matters, concluded the hearing. (R.R. at 194a.)

### C. The Report

The Hearing Officer's proposed report found, in pertinent part, that:

8. . . . Jordan reviewed the [VIID] for all inspections conducted at [Fulton's] [s]tation between January 1, 2013[,] and September 16, 2013. During this period, a total of 3,152 emission tests were conducted. Of this number, four were visual tests; and 3,148 were on board diagnostic ("OBD") tests.

. . . .

21. Of the 3,148 vehicles that . . . Fulton tested from January 1, 2013[,] to September 16, 2013[,] using OBD tests, . . . Jordan determined that 62 vehicles were legitimately tested.

22. . . . Jordan determined that the other 3,086 vehicles that . . . Fulton tested from January 1, 2013[,] to September 16, 2013[,] using OBD tests, were fraudulently tested using a donor vehicle.

. . . .

10

37. . . . Fulton did not consider his recurrent need to hit the retry button—as many as 3,000 times—as the result of the error message in order to issue an emission sticker, as indicative of an analyzer malfunction, because he was able to issue a sticker each time after hitting the retry button.

38. By the time . . . Fulton was ready to issue the sticker, all the data that was transmitted to the [VIID] from the vehicle connected to the analyzer had already been captured in the analyzer and the [VIID].

39. If . . . Fulton continued to operate the analyzer while it was malfunctioning and then furnished inspection stickers, he would be performing fraudulent inspections.

40. The analyzer appeared to be functioning properly during . . . Jordan's visit to the [s]tation, though it was not actually used to test a vehicle during the time.

. . . .

44. The fact that the tests performed on the 62 cars listed in Exhibit C-3 [*i.e.*, the Legitimate Test spreadsheet], which occurred during the same time period as the tests on the cars listed in Exhibit C-4 [*i.e.*, the Fraudulent Vehicle Emission Test spreadsheet], appear to be legitimate demonstrates that the analyzer was functioning normally as designed.

45. From January 1, 2013[,] to September 1[6], 2013, . . . Fulton furnished 3,086 certificates of inspection (emission stickers) to 3,086 vehicles that were not subject to emission testing.

. . . .

48. By recording the 3,086 emission inspections as being done properly and performed on the actual vehicle to be tested, when in fact a donor, or substitute, vehicle was used, . . . Fulton made a recordkeeping entry not in accordance with fact, truth[,] or required procedure, which falsified or concealed that a certificate of inspection was issued without compliance with the required inspection procedure.

(*Id*., Findings of Fact (FF) Nos. 8, 21, 22, 37-40, 44, 45, 48 (citations omitted).) The Hearing Officer determined that Fulton "did not present a consistent explanation for the malfunction in his analyzer, if a malfunction in fact existed," noting that "his testimony [was] riddled with inconsistencies and contradictions that reflect adversely on his credibility." (Report, FF No. 32; Discussion at 16.)

11

The Hearing Officer concluded that the Bureau satisfied its burden of proof that Fulton violated 67 Pa. Code § 177.427(3), when he furnished, lent, gave, or sold 3,086 certificates of emission inspections without inspecting the vehicles. (Report, Conclusions of Law (COL) Nos. 4, 5.) Similarly, the Hearing Officer concluded that the Bureau satisfied its burden of proof that Fulton violated 67 Pa. Code § 177.601, relating to fraudulent recordkeeping by: (1) recording into the analyzer and the VIID the results of 3,086 emission tests that were performed on a substitute vehicle instead of the vehicles that were supposed to be tested; and (2) issuing certificates of inspection for those 3,086 vehicles without complying with the required inspection procedure. (*Id*., COL No. 7.) The Hearing Officer further concluded that the Bureau was authorized pursuant to 67 Pa. Code § 177.603 to impose a permanent suspension of Fulton's inspector certification for violating either count a second time. (*Id*., COL Nos. 6, 8.)

By order dated June 15, 2018, the Hearing Officer dismissed Fulton's appeal and affirmed the Bureau's permanent suspension of his inspector certification. (Report at 22.) Fulton filed exceptions to the proposed report on July 18, 2018. (R.R. at 105a.) The Secretary denied Fulton's exceptions and affirmed the Hearing Officer's proposed report on April 1, 2019. (R.R. at 106a.) This appeal followed.[11]

---

[11] In *Mohamed v. Department of Transportation, Bureau of Motor Vehicles*, 40 A.3d 1186 (Pa. 2012), the Supreme Court held that courts of common pleas did not have subject matter jurisdiction of appeals from suspension of inspection mechanic certifications pursuant to Section 933 of the Judicial Code, 42 Pa. C.S. § 933, relating to appeals from government agencies, and former Section 4726(c) of the Vehicle Code, *formerly* 75 Pa. C.S. § 4726(c), relating to certification of mechanics—judicial review. As a consequence, under that statutory framework, Fulton properly filed his appeal with the Department at its administrative docket in accordance with the Administrative Agency Law, 2 Pa. C.S. §§ 501-588, 701-704, and 67 Pa. Code § 491.3 (relating to request for hearing). The Act of November 4, 2016, P.L. 1277, which became effective

## II. ISSUES

On appeal,[12] Fulton appears to argue that substantial evidence does not exist to support the crucial findings of fact. Finding of fact number 48, which appears to be the crucial finding based upon a culmination of many of the earlier findings, provides:

> By recording the 3,086 emission inspections as being done properly and performed on the actual vehicle to be tested, when in fact a donor, or substitute, vehicle was used, . . . Fulton made a recordkeeping entry not in accordance with fact, truth[,] or required procedure, which falsified or concealed that a certificate of inspection was issued without compliance with the required inspection procedure.

(Report, FF No. 48.) In support of that argument, he contends that he followed the emission inspection bylaws outlined in the vehicle Equipment & Inspection Regulation handbook and that any questionable data must have been the result of the analyzer malfunctioning, citing published reports of technical issues with analyzers that consistently arise while performing emission inspections. (Fulton's Brief at 8.) Fulton also appears to argue that the Department's suspension must fail because Jordan refused to examine the analyzer during the January 2014 investigation at his station. It is somewhat unclear whether Fulton advances this argument with regard to his substantial evidence argument or whether this is a separate argument that

---

on January 3, 2017, repealed former Section 4726(c) and amended Section 4724(b) of the Vehicle Code, 42 Pa. C.S. § 4724(b), relating to suspension of certifications of appointment—judicial review, to require that an appeal of an inspection mechanic suspension must be filed in a court of common pleas.

[12] "Our scope of review in an inspection certificate suspension case is limited to determining whether the [Department] committed an error of law or whether the [Department's] findings are supported by substantial evidence." *McCarthy v. Dep't of Transp.*, 7 A.3d 346, 350 (Pa. Cmwlth. 2010).

13

Jordan's alleged failure to examine the analyzer somehow causes the Department not to be able to meet its burden of proof.[13]

## III. DISCUSSION

Section 4726(a) of the Vehicle Code, 75 Pa. C.S. § 4726(a), authorizes the Department to certify mechanics to perform inspections of motor vehicles. The Department's power to certify inspectors comes with the responsibility to suspend or fine mechanics who do not comply with the statutory and regulatory requirements governing the inspection of motor vehicles. *See* 75 Pa. C.S. § 4726(b). It is axiomatic that an inspector's failure to comply with the appropriate provisions of the Vehicle Code[14] or Department regulations for the emission inspection program constitutes sufficient cause for the suspension of emission inspection privileges after providing the inspector with an opportunity for an evidentiary hearing. 67 Pa. Code § 177.603. "In cases involving alleged violations of the Vehicle Code and the regulations interpreting the same, the Department has the burden of proving such violations by a preponderance of the evidence." *Fiore Auto Serv. v. Dep't of Transp., Bureau of Motor Vehicles*, 735 A.2d 734, 736-37 (Pa. Cmwlth. 1998) (footnote omitted); *see* 67 Pa. Code § 491.10(b)(1). In other words, here, the Bureau must prove "that it is more likely tha[n] not, that a vehicle inspection was performed improperly." *Tropeck v. Dep't of Transp., Bureau of Motor Vehicles*, 847 A.2d 208, 212 (Pa. Cmwlth. 2004).

The Bureau, to support its decision in the matter before us, directs our attention to a panel decision from this Court for its persuasive value and similarity to Fulton's case: *Department of Transportation v. Northeast Community*

---

[13] Fulton's arguments are not set forth with the Court's standard of review in mind, and the Court has attempted to ascertain Fulton's arguments despite the shortcomings of his brief.

[14] 75 Pa. C.S. §§ 101-9805.

(Pa. Cmwlth., No. 1410 C.D. 2015, filed August 16, 2017).[15]   In *Northeast Community*, the Department permanently suspended an official emission inspection station's certificate of appointment because the station, for a second time, furnished emission certificates of inspection without conducting the emission inspections and engaged in fraudulent recordkeeping.  *Id.*, slip op. at 2.  The station appealed the suspension to the Court of Common Pleas of Philadelphia County, which conducted a hearing.

At the hearing before the trial court in *Northeast Community*, the Department called as a witness a Quality Assurance Officer (QAO) employed by Parsons.  *Id.* The QAO testified that he reviewed the VIID and discovered that the same PCM ID and PID combinations were repeatedly listed on the tests performed at the station. *Id.*, slip op. at 2-3.  The QAO testified that "similar to a [VIN] . . . each computer is different for each vehicle . . . [and] the PCM ID and the PID together are similar to DNA."  *Id.* at 3.

The QAO explained that he began his investigation by having a mechanic test a 1999 Isuzu Rodeo and a 2008 Toyota Scion using the station's analyzer.  *Id.* The Isuzu Rodeo's OBD VIN did not automatically show on the reports, but the OBD VIN was displayed automatically for the Toyota Scion.  *Id.*  The QAO testified that this was fine because the Toyota was manufactured after 2005.  *Id.*  The QAO indicated that the tests "were not conducted to determine the passing or failing of emission tests, but were intended to ensure that the analyzer was working correctly," and he concluded that the analyzer was calibrated correctly and the test was administered properly.  *Id.*

---

[15] Pursuant to Commonwealth Court Internal Operating Procedure Section 414(a), 210 Pa. Code § 69.414(a), an unreported opinion of the Court filed after January 15, 2008, may be cited only "for its persuasive value, but not as binding precedent."

The QAO also reviewed the VIID report, which revealed that the station administered 1,578 emission tests between July 25, 2013, and April 11, 2014, and of those, the station performed 562 tests on vehicles manufactured after 2005. *Id.*, slip op. at 4. The OBD VIN numbers were blank and each of the vehicles had PCM IDs of 10 and PID counts of 15. *Id.* The QAO explained that, in "order for all of these results to be the same, [the station] must be testing the same vehicle repeatedly while manually inputting different VIN numbers, a process known as 'clean screening.'" *Id.* The QAO testified that this is a problem because the vehicles that were obtaining these stickers were not tested properly, or at all, and the emission stickers were issued fraudulently. *Id.* On cross-examination, the QAO admitted that some vehicles could have the same PCM ID and PID count numbers and, on redirect, explained that the vehicles would be "'sister[-]related,' such as two BMWs." *Id.* The QAO stated that the combination of absent OBD VINs and repeated PCM IDs and PID counts on the 562 emission tests constituted the basis for his conclusion that these were fraudulent tests. *Id.*

The trial court in *Northeast Community* credited the QAO's testimony and sustained the Department's permanent suspension of the station's certificate of appointment. *Id.*, slip op. at 5. The station appealed the decision to this Court, claiming, in relevant part, that the trial court erred when it determined the Department met its burden of proof that the station furnished certificates of inspection without performing an inspection and committed fraudulent recordkeeping. *Id.* The station argued the QAO's testimony was inconsistent and contradictory because he initially testified that the PCM IDs and PID counts are the "DNA of a vehicle" but later conceded that sister-related vehicles could have the same PCM ID and PID count combinations. *Id.*, slip op. at 7. The station also argued

16

that there was no testimony concerning fraudulent recordkeeping and that "the relevant law refers to records kept by the station rather than records entered into the [VIID]." *Id*. The Department countered that the QAO's testimony was "not contradictory because he testified that the 562 test results were fraudulent based on the absence of the OBD VIN for the vehicles manufactured after 2005, as well as the identical PCM IDs and PID counts." *Id*. The Department asserted that the trial court could reasonably infer from the QAO's credited testimony that the violations occurred and that "it is not required to provide evidence that excluded all other possible interpretations in order for the evidence to meet its burden of proof." *Id*.

We rejected the station's argument that the QAO's testimony was inconsistent and contradictory, noting that the trial court specifically credited the QAO's testimony. *Id*., slip op. at 9. We concluded that the credited testimony supported the finding that the station entered the first vehicle's information into its computer and then performed the tests on a second vehicle, "thereby uploading the results of these falsified tests into the [VIID], which maintains a record of all tests performed in the Commonwealth." *Id*., slip op. at 9, 10. We determined that the station, upon intentionally entering false information to perform the tests, made "'[a] recordkeeping entry not in accordance with fact, truth or required procedure that falsifie[d] or conceal[ed] . . . [t]hat a certificate of inspection was issued without compliance with the required inspection procedure,' thus engaging in fraudulent recordkeeping." *Id*., slip op. at 10 (quoting 67 Pa. Code § 177.601.) In affirming the trial court's order, we concluded that the Department met its burden in proving

17

both that the station furnished emission certificates of inspection without actually conducting the inspections and that it engaged in fraudulent recordkeeping.[16] *Id.*

Our decision in *Northeast Community* is persuasive in terms of the appropriateness of the methodology used to determine whether a clean screening process was used during the emission testing process. Here, the Bureau, as it did in *Northeast Community*, utilized the VIID to obtain records of Fulton's station's vehicle emission tests for the relative time period and then dissected the obtained data to determine how many vehicle emission inspections were conducted at the station—3,148. Then, relying on factors that included review of the vehicles' OBD VIN number, PID count numbers, PCM ID number, and eight emission parameters being tested, the Bureau provided testimony through Jordan and documentary evidence that, of the 3,148 vehicles, only 62 vehicles were legitimately tested resulting in 3,086 vehicles tested using a clean screening process.

As to Fulton's argument that substantial evidence does not exist to support the crucial findings of fact, Fulton essentially contends that he followed the emission inspection bylaws outlined in the vehicle Equipment & Inspection Regulation handbook and that any questionable data must have been the result of the analyzer malfunctioning. The Hearing Officer and the Secretary, however, appear to have credited the testimony of Jordan over Fulton, thereby rejecting Fulton's testimony that he followed the proper protocols and that any questionable data resulted from the analyzer malfunctioning. In reaching this credibility determination, the Hearing Officer observed that "Fulton's testimony is riddled with inconsistencies and

---

[16] We note that "fraudulent" is not defined in the Department's regulations; however, we previously determined fraudulent conduct "occurs when an entry in the record . . . is false, entered intentionally and with the purpose of deceiving." *Fiore Auto Serv.*, 735 A.2d at 737. Determining whether the circumstances constitute fraud is primarily a factual determination. *Dep't of Transp. v. Sortino*, 462 A.2d 925, 927 (Pa. Cmwlth. 1983).

contradictions that reflect adversely on his compliance with required inspection procedures," particularly as his testimony relates to the nature of the alleged analyzer malfunction, the analyzer's repair history, and the actual existence of a malfunction. (Report at 16.) Fulton's argument on this point amounts to nothing more than a request for this Court to reweigh the same evidence that both the Hearing Officer and the Secretary weighed in deciding his appeal, which we cannot do. *See Sitoski v. Dep't of Transp., Bureau of Driver Licensing*, 11 A.3d 12, 17 (Pa. Cmwlth. 2010) ("Licensee essentially asks this Court to reweigh the evidence, find his evidence credible, and conclude that the Department failed to establish its burden of proof. However, this Court is not vested with the authority to do so."). In addition to relying on his own testimony, Fulton introduced the EPA Report into the record in an attempt to establish that technical issues with analyzers may arise while performing emission inspections. With regard to the EPA Report, however, Fulton admitted on cross-examination that it did not address his analyzer specifically and only provided that generally there are problems with analyzers and certain vehicles. (R.R. at 176a.) Fulton failed to establish a direct connection between his analyzer and OBD testability issues with any of the 3,086 vehicles that he tested. Thus, Fulton's contention on this point does not establish that substantial evidence does not exist to support the crucial findings of fact.

Finally, Fulton contends that the Department cannot prevail in this matter because Jordan failed to examine the analyzer at the station during the January 2014 audit. First, as to Fulton's contention that Jordan did not examine the analyzer, we note that Jordan testified that the analyzer appeared to be working at the time of her visit to the station, thereby suggesting some type of examination by Jordan, which the Hearing Officer and Secretary noted in finding of fact

19

number 40.[17] (R.R. at 142a.) Second, Fulton's argument appears to be an attempt to distinguish this matter from *Northeast Community*, wherein the Department's representative asked a mechanic to connect two vehicles to the station's analyzer to determine if it was calibrated properly and "to ensure that the analyzer was working correctly." *Id.*, slip op. at 3. The Bureau's failure to test the analyzer in the manner described in *Northeast Community*, however, is not fatal to its case, because Jordan's testimony was sufficient to allow a fact finder to find that Fulton engaged in a clean screening process. Our decision in *Northeast Community* does not require that such a test be conducted. Thus, we reject Fulton's contention that Jordan's failure to examine the analyzer dictates a different outcome.[18]

## IV. CONCLUSION

Accordingly, we affirm the order of the Department.

P. KEVIN BROBSON, Judge

---

[17] Furthermore, although Fulton initially testified that he demonstrated to Jordan during her visit that the analyzer was malfunctioning and affected the data transmitted, (R.R. at 167a), he later admitted that he had not demonstrated to her that the analyzer was not working properly. (R.R. at 88a.) Rather, he only showed her that one of the analyzer's cords was cracked. (*Id.*) Again, this suggests some type of examination.

[18] The Hearing Officer acknowledged that Jordan, on cross-examination, testified that prior to the hearing Fulton left messages on her answering machine, which she did not return. (R.R. at 160a.) We note that Jordan also testified that she cannot remember why she did not return the calls. (*Id.*) Nothing in the record suggests the content of the messages—*i.e.*, whether Fulton specified the reason for his call, had questions regarding the hearing, or was seeking to schedule further testing. Thus, Jordan's testimony does not support or contradict Fulton's assertion that he sought to have the analyzer tested.

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Robert Fulton,                :
            Petitioner      :
                         :
        v.               :    No. 672 C.D. 2019
                         :
Department of Transportation,   :
            Respondent   :

# **O R D E R**

AND NOW, this 19th day of February, 2021, the order of the Department of Transportation, dated April 1, 2019, and issued April 2, 2019, is AFFIRMED.

P. KEVIN BROBSON, Judge